**RONALD PRESS CO. v. SHEA.**

District Court, S. D. New York.
Feb. 21, 1939.

858

Robert H. Montgomery, of New York City (Thomas G. Haight, of Jersey City, N. J., and James O. Wynn and George G. Blattmachr, both of New York City, of counsel), for plaintiff.

Lamar Hardy, U. S. Atty., of New York City (Charles J. Nager, Asst. U. S. Atty., of New York City, of counsel), for defendant.

LEIBELL, District Judge.

The plaintiff sues to recover additional assessments of income tax, and interest thereon, paid to the Collector for the fiscal years ending March 31, 1929, and March 31st, 1930, respectively. For 1929 the additional assessment was $3,454.72 on which the taxpayer also paid $413.76 'interest. For 1930 the additional assessment was $1,-515.66 and the interest, $165.37.

A portion of the additional assessment for the fiscal year ended March 31, 1930, based upon the disallowance of a deduction of $2,433.49 for the State Franchise tax for 1931, is not disputed. The parties have agreed that, in the event of a decision in favor of the plaintiff, the amount of the judgment will be settled by stipulation.

The additional assessment for 1929, and the disputed part of the additional assessment for 1930, result from the Commissioner's action in disallowing $40,440.92 of the net losses of $70,936.94, claimed by plaintiff for the fiscal year ending March 31, 1928, which plaintiff sought to carry over and apply on its returns for 1929 and 1930, pursuant to the Revenue Act of 1928, Section 117 (a), (b) and (e), 26 U.S.C.A. § 117 note.

The plaintiff, a New York corporation organized prior to 1919, was engaged in the business of publishing and trading in books. In 1920 plaintiff caused to be organized and acquired all the stock of two corporations, Administration Publishing Corporation and the Management Engineering Corporation, for the purpose of publishing, through them, two certain magazines known as "Administration" and "Management Engineering". On November 13, 1923, the two subsidiary corporations were consolidated into one, the Management and Administration Corporation; on July 9, 1925, the name of the consolidated corporation was changed to Management Publishers Corporation, and on April 22, 1926, further changed to Manufacturing Industries, Inc. The name of the magazine was changed from "Management and Administration" to "Manufacturing Industries".

Until the subsidiary, Manufacturing Industries, Inc., was dissolved, January 31, 1928, as hereinafter related, the plaintiff, as parent, and its wholly owned subsidiary, continued as affiliated corporations, and the plaintiff annually filed consolidated income tax returns, reflecting the consolidated income and deductions of the two corpora-

tions for each fiscal year ending March 31st.

The plaintiff directed the activities of its subsidiaries and their consolidated successor and advanced to them from time to time the money needed to carry on their operations. In fact, the accounts of the operations of the subsidiaries were recorded on the plaintiff's books, as charges against the subsidiary corporations. Plaintiff incurred all the liabilities for the magazines and paid them from its own funds and from the receipts from the magazine business.

During the period from January 1, 1921, to March 31, 1927, the plaintiff advanced to its subsidiary, Manufacturing Industries, Inc. and two predecessor corporations which were consolidated into said subsidiary, $311,614.51. During that period the amount of these advances lost by the subsidiaries and reflected in the consolidated returns was $226,215.70. The difference was $85,398.81 and represented advances spent by the subsidiaries but not reflected in the consolidated returns (See Ex. 17). During the year ending March 31, 1928, plaintiff advanced to Manufacturing Industries, Inc. the further net sum of $40,440.92, which the latter lost in the course of its operations in that year.

On January 3, 1928, the plaintiff and Manufacturing Industries, Inc. entered into an agreement whereby the Manufacturing Industries, Inc., transferred all of its assets to the plaintiff, which the latter agreed to accept i_ cancellation of the debt of Manufacturing Industries, Inc., to the plaintiff, then stated as aggregating $357,349.01 ($352,055.43). Manufacturing Industries, Inc., was dissolved on January 31, 1928, and on February 1, 1928, the plaintiff sold the assets so acquired from Manufacturing Industries, Inc., for $45,000.

Plaintiff's books reflect plaintiff's transactions with its subsidiaries in a way that differs materially from the agreement of January 3, 1928, between plaintiff and its subsidiary. (Ex. 3). As of March 31, 1926, so much of plaintiff's advances to its subsidiaries as had been availed of in the consolidated returns as operating losses of the subsidiaries to offset profits of plaintiff, were deducted from the then total of plaintiff's advances and the balance of $85,398.81 was shown on the books as the net investment of plaintiff in its subsidiary. Indeed, this was listed in item 11 under the heading of "Other Assets" in both the 1927

and 1928 returns of plaintiff as "Net Investment in Magazine, $85,398.81". When the magazine assets were sold by plaintiff for $45,000 an account known as "Manufacturing Industries—Liquidation" was set up and the item of $85,398.81, as part of a larger item, was debited against said account under date of February 1, 1928, and on March 31, 1928, another item that included the $40,440.92 (the net amount plaintiff advanced to its subsidiary during the fiscal year ending that day) was also debited against that account. The Journal entry in relation to the transfer of this last mentioned item states that it was "To capitalize the loss for the year ending 3/31/28." In addition to certain small items, there was credited to the "Manufacturing Industries—Liquidation" account the $45,000 received from Mr. Ahrens, who purchased from plaintiff the magazine assets; one entry is for $10,000 paid by him on January 31, 1928 and another for $35,000 paid February 29, 1928. On March 31, 1928, the net debit balance of this "Manufacturing Industries—Liquidation" account was transferred to surplus and an entry was made in the Journal as follows: "Magazine Liquidation Account, to close the net investment in magazine into surplus $92,663.-72." The entries in the books control. They indicate that all that had been advanced by plaintiff to its subsidiary, less the amount previously taken as deductions in prior returns, as above stated, and less the amount realized on the sale of the magazine, was finally written into the Surplus Account and in effect was "charged off". American Cigarette & Cigar Co. v. Bowers, 2 Cir., 92 F.2d 596, 597.

Plaintiff's income tax return for 1928 does not agree with the statements contained in the agreement of January 3, 1928. In the income tax return filed by plaintiff for the fiscal year ending March 31, 1928, plaintiff entered under item 22 "Other Deductions" the following: "(d) Net Loss on Magazine Sale (Net Investment—$97,222.-82 less Sales Price $45,000) $52,222.82." An item of $11,824.01 for certain commissions was improperly included in the figure of $97,222.82 which should be $85,398.81, and in the sum of $52,222.82 which should be $40,398.81.

Concerning the item of $85,398.81 in the 1928 Income Tax Return, plaintiff's comptroller testified that it "represented the advances that the Ronald Press Company made on behalf of the magazine corporation for which it had not been reimbursed

and for which it had not deducted in any previous past returns * * *; that it represented the amount of money "that had been advanced by the parent to the subsidiary and really was an investment to the extent that it was entitled to collect that from the subsidiary". He testified further that it was considered by the company in the nature of an investment in the subsidiary "Only to the extent that it would be received back. It was a charge that the Ronald Press Company was entitled to collect from the magazine corporation". Later he testified that the reason said sum was not taken in prior years as an operating loss of the subsidiary was "because it did not represent operating expenses but it did represent capital investment".

The following is quoted from the protest filed November 12, 1930, on behalf of the plaintiff to the Commissioner's notice of deficiency in the tax for the fiscal year 1928–1929:

"The taxpayer's expenditures commenced in 1920 and were heaviest in the period from 1921 through 1924, inclusive. The directors of the taxpayer knew from their experience in the publishing business that these expenditures were building up a property of substantial value, and they knew, as a matter of sound business, that a part of the expenditures should be treated as the capital investment in the publications. Accordingly, the taxpayer's directors, after considering the number of the subscribers to the magazine and other relevant factors, determined the value of the investment therein at the close of each calendar year. The amount reached $85,398.00 in 1925 and was thereafter kept at this same figure. During this period the audited circulation had risen from nothing to 12,000 paid subscribers and over $200,000. had been expended in building up circulation and in securing advertising contracts. The value ($85,398.00) which the taxpayer's directors had set up as the capital investment was their determination of the fair value of the magazine properties, including the subscription list, trade name and good will.

"The operating losses, in excess of this sum, were annually deducted."

What plaintiff sold to Ahrens for $45,000 was all of plaintiff's "right, title and interest of every kind in and to the good will, name, subscriptions, advertising contracts, and trade mark" of the magazine, Manufacturing Industries (Exhibit A).

In its same return for said fiscal year ending March 31, 1928, which was a consolidated return, there was included plaintiff's gross income of $393,949.43 and the subsidiary's gross income of $19,075.55, a total of $413,024.98. Plaintiff's expenses were $384,046.64 and the subsidiary's expenses were $59,516.47. Plaintiff had a profit of $9,902.79 on its book business and the subsidiary had a loss of $40,440.92 on its magazine business (see Exs. 16 and 18). Plaintiff advanced money for or paid all the subsidiary's expenses, $59,516.47, and received all the subsidiary's income, $19,075.55. The difference between these last two figures was $40,440.92 and represented plaintiff's net advances to its subsidiary for that fiscal year. The net loss of $70,936.94 reported in the consolidated return for that fiscal year included this figure less the parent's profit of $9,902.79 for that year.

Thus, plaintiff's consolidated return for the fiscal year, ending March 31, 1928, reflected the operating losses of the subsidiary, Manufacturing Industries, Inc., in the amount of $40,440.92 for that year—the parent company's operating profit of $9,902.79—the parent company's net loss on magazine sale, figured on its net investment, $85,398.81 (not $97,222.82) less sales price, $45,000, of the magazine; all resulting in the aforementioned net loss of $70,936.94 for that fiscal year.

In plaintiff's return for the fiscal year ending March 31, 1929 (the subsidiary having been dissolved on January 31, 1928), the plaintiff claimed and took as a deduction the net loss of $70,936.94 shown on the consolidated return of the previous year, which it claimed the right to carry over, pursuant to the Revenue Act of 1928, Section 117; and since that deduction exceeded its income for 1929 by $11,039.08, the plaintiff in its return for the period ending March 31, 1930, carried the said item of $11,039.08 over as a deduction against its income for said period.

Thereafter, as the result of an audit of plaintiff's books, the Commissioner disallowed $40,440.92 of the loss which plaintiff had attempted to carry over from 1928, on the ground that such part of the loss consisted of the subsidiary's operating loss for the fiscal year ending March 31, 1928, and that after the termination of the period of affiliation plaintiff was entitled to carry over only its own losses, and not those of the subsidiary, citing Article 41(b), Regu-

lations 75. Such disallowance reduced the amount of loss allowed to be carried over from $70,936.94 to $30,496.02.

The Bureau of Internal Revenue in recomputing the tax refers to the item of $85,398.81 "as the cost to your company of the Manufacturing Industries Incorporated" and adds "that this company was sold to outside interests for $45,000.00 and that a loss of $40,398.81 was sustained". This loss was allowed as a deduction of The Ronald Press Company as it was an expenditure of that company, and against it was credited plaintiff's profit of $9,902.79, so that the net loss allowed plaintiff for 1928 was. $30,496.02. The $40,440.92 lost by the subsidiary from advances made by plaintiff, the parent company, were not allowed as a deduction to plaintiff.

The reason for disallowance given in the Commissioner's letter of January 16, 1931, was: "As the Ronald Press Company was not affiliated for the taxable year 1929, the loss of the Manufacturing Industries, Incorporated, cannot be used as a deduction in computing the income of the Ronald Press Company for the taxable year 1929." And in his letter of May 21, 1931, the Commissioner stated: "The deficiency for 1929 is not due to failure to allow any of the items agreed to in the conference in the Bureau, but to the application of the 1928 loss in computing 1929 income in accordance with Article 41(b) of Regulations 75."

■ This last statement contained error, in attempting to apply any part of Regulations 75 to this situation. Regulations 75 issued pursuant to Section 141, 26 U.S.C. A. § 141, were limited to the period covered by that section and applied to consolidated returns for 1929 and 'subsequent years. Plaintiff's last consolidated return was for 1928. Its affiliate was completely liquidated and dissolved in that year. Plaintiff filed only its own returns for 1929 and 1930.

■ The liquidation of the affiliate in this case occurred in the year 1928. We must look to Section 141 of the Revenue Act of 1928, 26 U.S.C.A. § 141, and Regulations 74 for guidance. The absence of any provisions in Regulations 74 similar to Articles 37(a), 40(a) and 40(c) of Regulations 75 (discussed in the Ilfeld case) is a clear indication that the unrecouped advances of plaintiff to its subsidiary in 1928 could, on the liquidation of the subsidiary in that taxable year, be deducted as a bad debt by the parent company. If it formed part of the plaintiff parent company's net loss for that year, § 117(a), Revenue Act 1928, it could under § 117(b) be taken as a deduction by plaintiff in the two succeeding taxable years as indicated in that section.

■ The net loss allowed as a deduction under Section 117 of the Revenue Act of 1928 may result from an investment under Section 23(f) or a bad debt under Section 23(j), 26 U.S.C.A. § 23(f) and (j) note. If plaintiff suffered this net loss in either form in 1928, on the liquidation of its subsidiary, it would be deductible in 1929 and 1930. A parent corporation's financial interest in its affiliate may be a stock interest, loans on notes or bonds, or advances for current expenses. Advances to the affiliate would be accounts receivable of the parent corporation, unless it chose at a later date to capitalize them for some good reason.

■ Plaintiff is not here attempting to take for tax reduction purposes the benefit of such advances a second time. No double deduction, either directly or indirectly, is involved. Plaintiff never received the benefit of these deductions in any form. Hence, Greif Cooperage Corp. v. Commissioner, 3 Cir., 85 F.2d 365, and cases cited therein do not apply. The money the affiliate lost in its operations in the tax year ending March 31, 1928, did not come from outsiders, but from the plaintiff. Hence there would be nothing inconsistent in permitting the parent corporation to claim as part of its net loss for 1928 so much of the affiliate's operating loss as was not offset by the parent corporation's operating profit in the consolidated return, where the affiliate is liquidated within the tax year and the extent of the parent corporation's loss is determined. Both the filing of the consolidated return [§ 142, 45 Stat. 832] and the determination of the parent corporation's net loss through the liquidation of the affiliate [§ 117(a) and (b)] are permissible under the statute. It follows therefore that the net loss of the parent corporation being thus determined in 1928 [§ 117(a)], could be carried over, under appropriate conditions, in 1929 and 1930 [§ 117(b)]. The loss of the plaintiff is a real one, suffered by it as a separate corporate entity. In G. C. M. 11676, Cumulative Bulletin XII-1, page 75 the following comment was made on the case of Burnet v. Aluminum Goods Manufacturing Co., 287 U.S. 544, 53 S.Ct. 227, 77 L.Ed. 484: "The court stated that the loss was a real one, suffered by the parent company as a separate corporate en-

tity, and it was equally a loss suffered by the single business carried on by the two corporations during the period of their affiliation. From such statement it may be doubted that a loss due to the ascertainment, upon complete liquidation, of the worthlessness of the stock investment and the parent company's claims for advances would be held by the court to be a part of an intercompany transaction under any of the regulations, at least prior to Regulations 75. It is believed that a deduction for a loss would be allowed by the court, under similar circumstances for any year to and including the taxable year 1928."

I am of the opinion that plaintiff's advances to its subsidiary for the fiscal year ending March 31, 1928, created an indebtedness of the subsidiary to the plaintiff. The contracts between the parties under which the advances were made so indicate. Such intercompany advances from the parent to its subsidiary would create accounts receivable for the parent corporation "quite independently of the regulations". Charles Ilfeld Co. v. Hernandez, 292 U.S. 62, 54 S.Ct. 596, 598, 78 L.Ed. 1127. The entries made on plaintiff's books on the last day of the fiscal year, transferring to the investment account the amount of such advances during that year and then including them in another figure transferred from the investment account to the magazine liquidation account, from which they passed into the surplus account as a debit do not affect either the nature of the loss or the result to plaintiff, i. e., advances to the subsidiary in that fiscal year that became a total loss in said year.

■ For taxable years prior to 1929 the liquidation of a subsidiary during the period of affiliation is not considered as an intercompany transaction. Walker Products Co. v. Commissioner, 30 B. T. A. 636, 643. Section 141 of the Revenue Act of 1928 and Regulations 75 issued thereunder and Ilfeld Co. v. Hernandez, supra, would apply to situations where the liquidation of the affiliate occurred in 1929 or subsequent tax years.

Section 142(a) of the Revenue Act of 1928 and Article 734 of Regulations 74 apply to the consolidated net income of affiliated corporations for 1928. They do not affect the right of the parent company to claim as losses either under Section 23(f) or Section 23(j) the moneys invested in or advanced to a subsidiary ascertained to be definitely lost by the liquidation of the subsidiary in 1928. A comparison of Regulations 74 issued under Section 142 and Regulations 75 issued under Section 141 shows a marked difference in respect to the effect of the liquidation of an affiliate during the consolidated period on the right of the parent company to deduct as losses its stock investment in or advances made to the affiliate.

Regulations 75 have the following introductory statement:

"Application of Regulations

"(a) 1929 and Subsequent Years.

"These regulations are applicable only to the taxable year 1929 and to subsequent taxable years.

"(b) 1928 and Prior Years.

"The regulations applicable to the taxable year 1928 will be found as a part of Regulations 74 (arts. 731 to 735, inclusive), and the regulations applicable to the taxable year 1927 or any prior taxable year will be found in the prior regulations, and the amendments thereto."

There is nothing in Articles 731 to 735 inclusive of Regulations 74 that corresponds to Article 37(a) or Article 40(a) of Regulations 75. In Ilfeld v. Hernandez, supra, these two articles are referred to as follows [292 U.S. 62, 54 S.Ct. 598]: "Article 37(a) forbids the recognition of losses upon distribution during the consolidated return period and declares that such distributions shall be considered intercompany transactions. Article 40(a) forbids during that period the deduction as bad debts of obligations which are the result of intercompany transactions."

■ It is apparent, therefore, that the Commissioner in preparing Regulations 74 and 75 intended that the more burdensome provisions of Regulations 75 in respect to consolidated returns should not go into effect in 1928, the same year in which the Revenue Act was enacted, but should apply to the year 1929 and subsequent years.

In Burnet v. Riggs National Bank, 4 Cir., 57 F.2d 980, the Court had before it Section 240 of the Revenue Act of 1921 and Treasury Regulations 62, Article 636. Section 142 of the Revenue Act of 1928 is very similar to Section 240 of the Revenue Act of 1921. Likewise, Article 636 of Regulations 62, issued under Section 240 of the Revenue Act of 1921, is very similar to Article 734 of Regulations 74, issued under Section 142 of the Revenue Act of 1928.

The facts in the Riggs National Bank case parallel those of the present case in some respects.

■ If the parent company is able to show that its losses on its stock ownership in and on its advances to a subsidiary, sustained on the liquidation of the subsidiary, exceeds the amount to which the parent company, in consolidated returns for prior taxable years, has used the losses of its subsidiary in reduction of its own profits, the excess constitutes a proper deductible loss of the parent company in the year in which its subsidiary is liquidated. McLaughlin v. Pacific Lumber Co., 293 U.S. 351, 55 S.Ct. 219, 79 L.Ed. 423. If plaintiff's right to deduct as a loss the money it advanced to its subsidiary were the only issue in this case, I should hold that plaintiff is entitled to recover. But there are other issues that will be discussed later, which in my opinion bar a recovery.

The amended complaint herein, verified July 15, 1938, was served September 9, 1938, pursuant to a stipulation under which the defendant reserved all its rights to any defense it might have, jurisdictional or otherwise, including any defense based on the contention (1) that the amended complaint constituted a departure from the original complaint and (2) that the amended complaint is not based upon grounds set forth in the claims for refund filed by the plaintiff. The answer to the amended complaint, in addition to denials of many of the allegations of the amended complaint, pleaded three special defenses.

■ The first special defense is that the amended complaint set forth new and distinct causes of action, which were not contained in the original complaint and were not brought within the time limited by law for commencing an action thereon, and are therefore barred. I think the defense is good. It is true that "a liberal rule should be applied". New York Central & H. R. R. Co. v. Kinney, 260 U.S. 340, 346, 43 S.Ct. 122, 123, 67 L.Ed. 294 and that Rule 15(c) of the new Federal Rules of Civil Procedure which went into effect September 16, 1938, 28 U.S.C.A. following section 723c, permits the amended pleading to date back to the original pleading, where the claims asserted in the amended pleading arose out of the transaction set forth or attempted to be set forth in the original pleading. But the amended complaint does not meet that condition. Not only are the amounts and dates different but there are pleaded certain basic allegations, such as the making of the agreement of January 3, 1928, which are not mentioned in the original complaint. Likewise, there are important allegations of the original complaint which do not appear in the amended complaint. (Compare paragraphs 9, 22 and 24 of the original complaint with paragraphs 13 and 14 of the amended complaint.) Having in mind the provisions of the stipulation and the special defense, I conclude that the causes of action pleaded in the amended complaint are barred by the Statute of Limitations controlling suits against the United States to recover taxes illegally collected. 26 U.S.C.A. §§ 1672–1673 and notes thereunder.

■ In its second special defense defendant alleges: "XXIII. That the causes of action set forth in the amended complaint herein seek the recovery of income taxes on different grounds than the grounds set forth in plaintiff's claims for refund which were rejected by the Commissioner of Internal Revenue."

The claims for refund for the fiscal years ending March 31, 1929 and March 31, 1930 are exhibits 24 and 25. They were filed June 30, 1932. In each of them the taxpayer states that it has fully set forth the facts and arguments in protests filed with the Commissioner of Internal Revenue on November 12, 1930 and March 2, 1931, but that a brief resume is set forth in the claim for refund.

In the first protest filed November 12, 1930, the taxpayer took issue with a ruling of the Bureau which held that the taxpayer was not entitled to any deduction whatsoever on its investment in or advances to the subsidiary and that the $45,000 received on the sale of the magazine was profit to the taxpayer. The taxpayer argued in its protest of November 11, 1930, that its investment in its subsidiary was $85,398.81 against which it had realized on the sale of the magazine $45,000, indicating a loss of $40,398.81, instead of a profit of $45,000, as the department had found. After a consideration of the protest, the Commissioner, in his letter of January 16, 1931 (Ex. 20), ruled that the $45,000 was not profit to the taxpayer; that the cost of the Manufacturing Industries, Inc., to the taxpayer, The Ronald Press Company, was $85,398.81; that the subsidiary was sold to outside interests for $45,000, and that a loss of $40,-398.81 was sustained which should be "allowed as a deduction of The Ronald Press

Company, as it was an expenditure of that company".

The claims for refund are based on the alleged loss sustained by the taxpayer on the sale of the magazine. They assert that the cost of the magazine to the taxpayer was $357,349.01, the amount of the subsidiary's indebtedness to the taxpayer (this included an interest item of $5,293.50); that this indebtedness was cancelled in consideration of the transfer of the subsidiary's assets (the magazine) to the taxpayer; that this asset was thus acquired by the taxpayer on January 3, 1928, prior to the dissolution of the subsidiary, which took place on January 31, 1928; and that the asset was sold February 1, 1928, for $45,000, after the subsidiary was dissolved.

This was one of the theories of claim advanced in the second protest filed by the taxpayer March 2, 1931, and as authority therefor the taxpayer had cited in its said protest the case of Liberty National Co. v. Commissioner, 18 B.T.A. 510 (decided December 16, 1929), in which the Commissioner had acquiesced (IX–36–4769). That case was reversed, however, March 7, 1932 in 10 Cir., 58 F.2d 57, and certiorari was denied October 10, 1932 in 287 U.S. 603, 53 S.Ct. 9, 77 L.Ed. 525.

In the protest of March 2, 1932, the taxpayer advanced the further theory that "if the Treasury should regard the transaction as a sale of the stock of the Manufacturing Industries, Inc.", as implied in a quotation from the Treasury's letter of January 16, 1931, that the cost to the taxpayer of the Manufacturing Industries, Inc., was $85,398.81, "the taxpayer sustained a deductible loss of $312,349.01"; that its investment in Manufacturing Industries, Inc. was $357,349.01. The taxpayer then cited United Publishers' Corp. v. Anderson, D.C., 42 F.2d 781, and G.C.M. 8889, C.B. IX–2–236. The United Publishers' Corp. case was disapproved by the Supreme Court in the Ilfeld case, decided April 2, 1934; and G.C.M. 8889 was revoked by G.C.M. 11676, Cumulative Bulletin XII–1, page 75, in the early part of 1933.

In the protest of March 2, 1932, the taxpayer put forth a third proposition—that the ruling of the Treasury "that the cost of the magazine to the taxpayer was therefore only $85,398.81, the amount capitalized as the cost of building up the magazine" must have been made on the theory that "the magazine was actually published and operated by the taxpayer; that the operating losses which were paid by the taxpayer were in fact losses of the taxpayer and not investments in the subsidiary". The protest then urged that if that theory were correct "the operating loss of $40,440.92 sustained in the year 1928 was a loss of the taxpayer, not of the subsidiary, and must be allowed as a deduction from the taxpayer's income for the year 1929".

The concluding paragraph of the protest of March 2, 1931, stated: "The taxpayer is willing to accept a settlement on this basis, that is, carrying forward the operating loss of $40,440.92, solely to close the case. If an appeal to the Board of Tax Appeals is required the taxpayer will contend for a loss of $312,349.01 which it would seem that the Board must allow."

All of the theories advanced in the protest of March 2, 1932, are alleged in some form in the four causes of action pleaded in the original complaint.

It should be noted that neither the protest of November 11, 1930, nor the protest of March 2, 1931, advanced the theory of a bad debt due from the subsidiary to the taxpayer, ascertained to be worthless and charged off in the fiscal year ending March 31, 1928. Nor do the claims for refund assert a loss in the nature of a bad debt. The claims for refund were rejected by the Commissioner in a letter dated August 17, 1932 (Ex. 26).

The amended complaint alleges (paragraph 13) that the subsidiary prior to April 1, 1927, was indebted to the plaintiff in the amount of $85,398.81 in excess of the operating losses of the subsidiary reflected in the consolidated income tax returns theretofore filed by the plaintiff; that during the period between April 1, 1927 and January 31, 1928, the plaintiff advanced to or on behalf of the subsidiary the sum of $40,440.92; that on January 3, 1928, the plaintiff entered into an agreement with the subsidiary whereby the plaintiff agreed to accept all of the assets of the subsidiary in cancellation of the debt of the subsidiary to the plaintiff; that said assets had a fair market value of $45,000 when turned over to the plaintiff and when sold by plaintiff on or about February 1, 1928, for that sum, and that the subsidiary had no further assets when dissolved on January 31, 1928. In paragraph "14" it is alleged that subsequent to April 1, 1927, and prior to March 31, 1928, plaintiff ascertained that the indebtedness of Manufacturing Industries, Inc. to the plaintiff, in excess of the oper-

ating losses of said Manufacturing Industries, Inc., reflected in the consolidated returns, was worthless to the extent of $80,839.73 ($85,398.81 plus $40,440.92, less $45,000) and charged off the said indebtedness on its books.

The amended complaint disregarded entirely the contention that the $85,398.81 was plaintiff's investment in its subsidiary, as had been represented in the first protest filed with the Commissioner on which he allowed the plaintiff a deduction of $40,398.81, the difference between the $45,000 plaintiff realized on the sale of the assets to its subsidiary and the amount of its said investment. The amended complaint characterizes this $85,398.81 as an indebtedness of the subsidiary to the plaintiff for fiscal years ending March 31, 1927, in excess of the operating losses of the subsidiary that had been reflected in the consolidated income tax returns theretofore filed by the plaintiff.

The amended complaint is based on the theory of a bad debt [§ 23(j), Revenue Act 1928, 26 U.S.C.A. § 23 note] ascertained to be worthless and charged off in the fiscal year ending March 31, 1928; the claims for refund are based on the theory of a loss on the sale of assets owned by the taxpayer [§ 23(f), Revenue Act 1928, 26 U.S.C.A. § 23(f)]. It has been held that these two subdivisions of Section 23 are mutually exclusive. Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 189, 54 S.Ct. 644, 78 L.Ed. 1200. The distinction between a business loss and a bad debt is made in the statute not merely by putting them in separate subdivisions. The proof required in the one case is that the loss be "sustained during the taxable year and not compensated for by insurance or otherwise"; in the other, that the bad debt be "ascertained to be worthless and charged off within the taxable year". In my opinion there is such a variance between the claims for refund and the amended complaint in this case that the latter cannot be said to be based on the former. The amended complaint for that reason also, must be dismissed. Dascomb v. McCuen, 2 Cir., 73 F.2d 417.

This case was tried before the Court without a jury and this opinion constitutes the Court's findings of fact and conclusions of law. Defendant is entitled to judgment dismissing the amended complaint, with costs. Judgment should be entered accordingly.